## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FERNANDO MARTINEZ AND | : | CIVIL ACTION |
| LUCY MARTINEZ, H/W | : | |
| | : | NO.  05-4534 |
| v. | : | |
| | : | |
| TRIAD CONTROLS, INC., et al. | : | |

### MEMORANDUM AND ORDER

Kauffman, J.                                                          January 6         , 2009

      Plaintiffs Fernando and Lucy Martinez brought this action against Defendants Triad

Controls, Inc. ("Triad"); Ingersoll Rand, Ingersoll-Rand Canada, Inc., and Canada Machinery

Corporation, Ltd. (collectively "Ingersoll-Rand");[1] Northern Machinery, Inc.; Francis A. Blake;

and E.W. Bliss Company, alleging strict liability, negligence, and loss of consortium.[2]  Now

before the Court are the Motions for Summary Judgment of Defendants Triad and Ingersoll-

Rand.  For the reasons that follow, the Motions will be granted in part and denied in part.

### I. Background

      This case arises out of a July 30, 2003 accident at Laneko Manufacturing ("Laneko") in

Royersford, Pennsylvania that resulted in the amputation of several fingers on the right hand of

Plaintiff Fernando Martinez.  On that day, Plaintiff and a co-worker, Joshua Thumm ("Thumm"),

were operating a CMC Bliss 300 ton mechanical power press (the "press") to form metal parts

---

[1]     Canada Machinery Corporation is now owned by Ingersoll-Rand.  Ingersoll-Rand Canada, Inc. is a defunct company.

[2]     All strict liability and negligence claims are brought solely by Fernando Martinez, who was injured in the underlying accident.  The loss of consortium claim is brought solely by his wife, Lucy Martinez.  The Court will refer to Fernando Martinez, alone, as "Plaintiff," and Fernando and Lucy Martinez, collectively, as "Plaintiffs."  The Court will generally refer to Plaintiff alone; it will refer to Plaintiffs only when discussing their shared expert witness.

1

for the automobile industry.  The press was equipped with two sets of die, which allowed two

different metal parts to be formed at the same time.  The press was operated using controls called

"palm buttons."  Palm buttons are point of operation safety devices that require a worker to have

both hands on the buttons (rather than in the press) before the press's ram will descend.[3]  Each

set of palm buttons is designed to protect both hands of one  worker.  The press at issue was

designed to accept two sets of palm buttons, thereby ensuring that both members of the two-man

team had their hands clear of the press.  However, at the time of the accident, a "dummy plug"

was being used in place of one of the sets of palm buttons, so that the press could operate with

only one set of buttons.

In addition, the press was equipped with another pair of point of operation safety devices,

two Triad Super Light VI light curtains (the "light curtains").  The light curtains were mounted

on the front and back of the press, and used a set of invisible infrared light beams to detect when

the work area around the press was penetrated.  If the light curtains were penetrated, they were

designed to send a signal to the press to prevent it from operating.[4]  The vertical position of the

light curtains was adjustable, but was supposed to be mounted so that no gaps existed in the

curtains' coverage.

On the day of the accident, Plaintiff and Thumm stood side-by-side on wooden pallets in

front of the press as they worked.  Plaintiff's role was to place a partially-formed metal piece into

the die in front of him.  At the same time, Thumm would take a piece that already had been

---

[3]      The "point of operation" on a power press is the area where metal is placed prior
to being formed.

[4]      The light curtains had a feature known as a "floating blank," which allowed up to
three infrared beams to be "muted" in order to allow a piece of metal to penetrate the infrared
light field without a stop signal being sent to the press.  However, when a "floating blank" is
used, entry into the protected area by a worker still is supposed to send a stop signal to the press.

stamped by Plaintiff's die and move it into the second die on the press.  After the two pieces of metal were positioned, both men would step behind the light curtains, and Thumm would depress the set of palm buttons operating the press.[5]

Prior to the accident, Plaintiff and Thumm had pressed approximately 200 metal pieces, and both the press and light curtains had been functioning properly.  Plaintiff was injured when the ram descended on his right hand while it was in the press area.  Immediately following the accident, which occurred at approximately 11:45 a.m., local police arrived on the scene to conduct an accident investigation.  Several Laneko employees testified that when the police tested the light curtains and palm buttons, they were found to be operational.  See Deposition of James McGough ("McGough Dep.") at 31–32, attached to Ingersoll-Rand Mot. at Ex. E and Triad Mot. at Ex. H; Deposition of Ronald Paden ("Paden Dep.") at 51–52, attached to Ingersoll-Rand Mot. at Ex. C and Triad Mot. at Ex. B; Deposition of David Hoffman ("Hoffman Dep.") at 25–26, attached to Ingersoll-Rand Mot. at Ex. J and Triad Mot. at Ex. K.

Plaintiffs filed the instant action in the Philadelphia Court of Common Pleas, and it was removed to this Court on August 26, 2005.  In the Complaint, Plaintiffs assert claims of negligence and strict liability against several parties, as well as a claim for loss of consortium. The instant Motions concern the strict liability claims against Ingersoll-Rand, as manufacturer of the press, and Triad, as manufacturer of the light curtains.

## II. Legal Standard

In deciding a motion for summary judgment pursuant to Fed. R. Civ. P. 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law."  Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir.

---

[5]     Plaintiff did not have to press a set of palm buttons since there was a "dummy plug" in place of the second set of palm buttons.

1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine the evidence in the light most favorable to the non-moving party and resolve all reasonable inferences in that party's favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "there can be 'no genuine issue as to any material fact' . . . [where the non-moving party's] complete failure of proof concerning an essential element of [its] case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The party moving for summary judgment bears the initial burden of showing the basis for its motion.  See Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  If the movant meets that burden, the onus then "shifts to the non-moving party to set forth specific facts showing the existence of [a genuine issue of material fact] for trial."  Id.

## III.  Expert Witness L.D. Ryan, Ph.D.

Ingersoll-Rand argues that the opinions of Plaintiffs' expert witness, mechanical engineer L.D. Ryan ("Dr. Ryan"), should be excluded pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), because they are unreliable, are based on insufficient facts and data, have not been scientifically tested, and rely on intuition and speculation.[6]  See Ingersoll-Rand Mot. at 7.  Triad makes similar arguments in its Motion, asserting that Dr. Ryan lacks expertise with light curtains and that his methodology is not based in science and cannot be tested.  See Triad Mot. at 27–32.  Plaintiffs respond that Dr. Ryan's professional education and

---

[6]    Because Plaintiff Lucy Martinez's loss of consortium claim derives from and relies on her husband's strict liability and negligence claims, the Court will refer to Dr. Ryan as "Plaintiffs' expert witness."

training, practical experience, and academic experience fulfill the qualification standards under Daubert and that his methodology and opinions meet the Daubert reliability standard.  See Resp. to Ingersoll-Rand Mot. at 8–21; Resp. to Triad Mot. at 18–29.

If Dr. Ryan's expert testimony were excluded, Ingersoll-Rand and Triad argue that summary judgment must be granted in their favor on the strict liability claims.  The Third Circuit has held that expert testimony generally is required in a case where a design defect is alleged.  See Oddi v. Ford Motor Co., 234 F.3d 136, 159 (3d Cir. 2000); see also Booth v. Black & Decker, Inc., 166 F. Supp. 2d 215, 222 (E.D. Pa. 2001).  While there may be some instances in which a defective condition can be established through non-expert evidence, that is not the case when the inner-workings of a machine are unfamiliar to the public at large.  See Oddi 234 F.3d at 159.

### A.    Experience of Dr. Ryan

Dr. Ryan has Bachelor of Science and Master of Science degrees in mechanical engineering and a Doctorate in agricultural engineering.  See L.D. Ryan's Curriculum Vitae, attached to Plaintiffs' Index of Exhibits ("Pls.' Index") at Ex. B, App'x O.[7]  He has over twenty years of experience teaching mechanical engineering at the collegiate level, and he is a licensed engineer in multiple states.  See id.  He also has many years of experience as a machine designer and product developer, and is an accident reconstructionist.  See id.; Deposition of J.D. Ryan ("Ryan Dep.") at 21, attached to Ingersoll-Rand Mot. at Ex. L and Triad Mot. at Ex. C.

Dr. Ryan has experience manufacturing power presses such as the one at issue in this case and has taught courses in the design and use of power presses.  See Ryan Dep. at 52, 177.  He previously has been qualified to testify as an expert on power presses.  See id. at 181.  He has

---

[7]    Plaintiffs filed one index of exhibits in support of both their Response to the Ingersoll-Rand Motion and their Response to the Triad Motion.

never designed or manufactured a light curtain, worked for a company that manufactured a light curtain, or installed a light curtain; however, he has been qualified as an expert to testify regarding light curtains in other litigation.  <u>See id.</u> at 19–20.  In addition, he has written a manual on safety warnings.  <u>See</u> Warnings Manual, attached to Pls.' Index at Ex. C.

 To prepare for the instant matter, Dr. Ryan conducted a site inspection of the accident area on November 17, 2005, approximately 27 months after the accident.  <u>See</u> Ryan Dep. at 8. During the inspection, he made measurements, took pictures, shot video, and conducted testing during which he determined that the light curtain was not adjusted properly and that the lower lights on the curtain were not working at the time of his inspection.  <u>See</u> Preliminary Engineering Opinions ("Ryan Rep."), attached to Pls.' Index at Ex. A.  He also examined documents produced by Defendants and certain deposition testimony from this case.  <u>See</u> Ryan Dep. at 27–28.  In addition, he reviewed an extensive list of publications, including American National Standards Institute ("ANSI") standards and Occupational Safety and Health Administration ("OSHA") regulations, publications on occupational safety, documentation on light curtains and other proposed alternate technologies, publications on product safety signs and labels, Bureau of Labor Statistics data, and publications on "human factors."  <u>See</u> Preliminary Research Appendices, attached to Pls.' Index at Ex. B.

 **B.** **Legal Standard for the Admissibility of Experts**

 Federal Rule of Evidence 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In <u>Daubert</u>, the Supreme Court found that Rule 702  "clearly contemplates some degree of

regulation of the subjects about which an expert may testify." 509 U.S. at 589. As a result, Daubert established a "gatekeeping role for the [trial] judge." Id. at 597.

> The trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Id. at 592–93.[8] In applying Daubert, the Third Circuit has found that Rule 702 "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741–43 (3d Cir. 1994)).

The Court must decide whether an expert is qualified by examining his or her specialized knowledge with respect to the proposed area of testimony. See Fed. R. Evid. 702. The Third Circuit has held that "a broad range of knowledge, skills, and training qualify an expert as such," and has "eschewed imposing overly rigorous requirements of expertise and . . . been satisfied with more generalized qualifications." In re Paoli, 35 F.3d at 741 (citations omitted). An expert's specialized knowledge can be based on "practical experience as well as academic training and credentials." Fisher v. Walsh Parts & Servs. Co., 277 F. Supp. 2d 496, 504 (E.D. Pa. 2003). However, at a minimum, an expert must possess skills or knowledge greater than the average layman. Elcock, 233 F.3d at 741 (citation omitted).

If the specialized knowledge requirement is met, the Court must decide whether the expert's methodology is reliable. An expert's testimony is reliable if it is based on "the methods

---

[8]     Although Daubert was decided in the context of scientific knowledge, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court extended its holding to include "technical or other specialized knowledge."

and procedures of science" rather than on "subjective belief or unsupported speculation."  In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 589–90).  In assessing the reliability of an expert's methodology, the Court may consider the following factors: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."  Id. at 742 n.8 (citing Daubert and United States v. Downing, 753 F.2d 1124, 1238–41 (3d Cir. 1985)).  The Supreme Court has made clear that this is not an exclusive list of factors, and that not all factors may be relevant in a particular case.  Elcock, 233 F.3d at 746 (citing Kumho, 526 U.S. at 152).   In addition, even if the Court believes there are better grounds for an alternate conclusion or that there are some flaws in an expert's methods, the testimony should be admitted if there are "good grounds" for it.  Heller v. Shaw Indus., Inc., 167 F.3d 146, 152–53 (3d Cir. 1999) (citing In re Paoli, 35 F.3d at 744); see also Oddi v. Ford Motor Co., 234 F.3d 136, 145–46 (3d Cir. 2000) ("The test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct.  Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology." (citations and internal quotation omitted)).[9]

        Finally, the Court must determine whether there is "fit"; in other words, whether the

_____

        [9]        In Heller, the Third Circuit noted that "[c]learly the [Supreme] Court envisioned cases in which expert testimony meets the Daubert standard yet is 'shaky,' and cases in which admissible expert testimony provides only a 'scintilla' of support for a claim or defense.  Put differently, an expert opinion must be based on reliable methodology and must reliably flow from the methodology and the facts at issue — but it need not be so persuasive as to meet a party's burden of proof or even necessarily its burden of production."  Heller, 167 F.3d at 152.

"reasoning or methodology . . . properly can be applied to the facts in issue." Daubert, 509 U.S. at 592–93.  When analyzing the "fit" of proposed testimony, the Court must examine "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." In re Paoli, 35 F.3d at 743 (quoting Downing, 753 F.2d at 1237).  Even if an expert's proposed testimony embodies scientific knowledge, it should be excluded if it will not assist the trier of fact in the particular case.  See id.  The standard is not intended to be a high one, but it is higher than "bare relevance." Id. at 745.

### C.     Analysis of Dr. Ryan's Proposed Testimony Regarding the Press

According to Plaintiffs, Dr. Ryan would testify to the following: (1) the press controls should have been fixed in place; (2) the warning labels on the press were not of adequate durability to remain legible for the effective life of the press; (3) Ingersoll-Rand failed to warn properly of the point of operation hazard inherent in power presses; and (4) the press should have been equipped with a Programmable Logic Controller ("PLC") that would have detected whether two workers were operating the press improperly.  See Resp. to Ingersoll-Rand Mot. at 9-10.  As an initial matter, the Court notes that Ingersoll-Rand concedes that it is not "attacking Dr. Ryan's qualifications."  Hr'g Tr. (4/21/2008) at 19.  Thus, Dr. Ryan's qualifications to be an expert on the power press at issue satisfy the first prong of Third Circuit's test.

Instead of challenging Dr. Ryan's qualifications, Ingersoll-Rand challenges the reliability and fit of his methodology, as well as his lack of testing, arguing that there are two primary reasons why his expert testimony should be precluded:  First, Dr. Ryan's assertions are allegedly contrary to OSHA regulations.  Second, Dr. Ryan has suggested that the press should have been equipped with a PLC that would have detected whether two workers were operating the press properly.  See Resp. to Ingersoll-Rand Mot. at 6–7.  Ingersoll-Rand contends that his opinion

runs afoul of Daubert requirements because he made no attempt to test his hypothesis that a PLC could be used on a press.

With respect to the argument regarding OSHA regulations, Ingersoll-Rand notes that it is Dr. Ryan's opinion that it provided "state of the art" safety devices with the press, but that it did not take the "responsibility [to] make sure these safety devices are used."  See Ingersoll-Rand Mot. at 12–13 (citing Ryan Dep. at 94, 96–97, 114).  Ingersoll-Rand also notes that Dr. Ryan believes that the employer in this case, Laneko, "should have prevented bypassing of dual hand controls" and that the dual two-hand control design was "overridden by plant personnel."  Id. at 14 (citing Ryan Dep. at 133).  Ingersoll-Rand argues that these opinions about Laneko are consistent with OSHA regulations pertaining to mechanical power presses, which place the responsibility on the employer to ensure usage of properly adjusted point of operation safety devices, to provide hand controls for each operator, and to check at the beginning of each shift to make sure that all safeguarding is in place. See id. (citing 29 C.F.R. §§ 1910.217(c)(1)(i), 1910.217(c)(3)(vii)(a), 1910.217(h)(10)(ii)(D)).  In light of these regulations, Ingersoll-Rand contends that Dr. Ryan's opinion does not "fit" the facts of the case and that he does not have "good grounds" to support his argument that the Ingersoll-Rand Defendants had the responsibility to ensure that the safety devices are used.

As will be discussed more fully in Section IV.B, infra, Pennsylvania law prohibits a defendant manufacturer like Ingersoll-Rand from invoking OSHA regulations to argue that the plaintiff's employer rather than the manufacturer had the responsibility to provide the equipment or instructions needed to make a product safe for its intended use.  See Forrest v. Beloit Corp., 424 F.3d 344, 352 (3d Cir. 2005); Nesbitt v. Sears, Roebuck & Co., 415 F. Supp. 2d 530, 534 (E.D. Pa. 2005); see also Section IV.B infra.  Regardless of any possible OSHA violations by

10

Laneko, Dr. Ryan has alleged a number of ways in which the power press was designed defectively by Ingersoll-Rand so that it was not safe for its intended use.  For example, Dr. Ryan opines that the controls of the press should have been fixed to ensure that they could not be moved in such a way as to expose employees to the point of operation.  See Ryan Rep. at ¶ 7.  He also contends that the warnings on the press were not durable enough to remain legible for the effective life of the press.  See id. at ¶ 11.  According to Plaintiffs, had these alleged defects not existed, the accident in this case would not have occurred regardless of whether Laneko followed OSHA regulations.  Accordingly, Dr. Ryan has raised grounds to support liability for Ingersoll-Rand that "fit" the facts of the case.

With respect to Dr. Ryan's opinion that the press should have been equipped with a PLC, Ingersoll-Rand argues that he has never tested his hypothesis that a PLC could be used in the manner he describes, that he dismisses the concept of testing as "lawyer bologna," and that he does not take into consideration all the variables that would be involved in using a PLC on a mechanical power press.  See Ingersoll-Rand Mot. at 18–30.  Therefore, it argues, his testimony is neither reliable nor does it "fit" the facts of the case under the Third Circuit's test.

Although Dr. Ryan has not created a PLC in this case, he has designed and utilized PLC devices in the past to control and operate other types of machinery or perform other functions, and is familiar with how to use PLCs to perform complicated electrical functions.  See Ryan Rep. at ¶ 13.  Moreover, he testified at his deposition that he has seen a different model of press operated by a PLC in the past.  See Ryan Dep. at 103.  Thus, Dr. Ryan's opinion regarding the PLC is founded in both his experience as an engineer as well as a methodology that he has utilized successfully in the past.  While Ingersoll-Rand's contentions properly go to whether strict liability is appropriate, see Section IV.A.2, infra, these criticisms do not undermine the

reliability or fit of Dr. Ryan's testimony.  See, e.g., Fisher, 277 F. Supp. 2d at 507–08 (stating

that while some of an expert's conclusions "may not be proven by the methodology relied upon,"

nevertheless admission may be appropriate).  Accordingly, the Court rejects Ingersoll-Rand's

challenges to Dr. Ryan's ability to testify as an expert on the power press at issue in this case.

### D.      Analysis of Dr. Ryan's Proposed Testimony Regarding the Light Curtains

According to Plaintiffs, Dr. Ryan will testify to the following with respect to the design of

the light curtains at issue in this case: (1) they were defectively designed in that they could be

adjusted too high for safe operation and did not come equipped with a weld pad with tapped

mounting holes to prevent them from being adjusted vertically; (2) the lower part of the light

curtains was not working when he did his inspection; and (3) the failure of elements of the light

curtains did not cause the press to be placed in a non-operative state.  See Resp. to Triad Mot. at

9–10.  Triad argues that Dr. Ryan does not have the requisite experience with light curtains to

qualify as an expert on them, and that he has conceded that his theories and techniques with

respect to the light curtains in this case cannot be tested or subjected to peer review.  See Triad

Mot. at 24–33.  Specifically, Triad points to Dr. Ryan's deposition testimony that he never has

designed, manufactured, installed, or set up a light curtain or worked for a company that designs

or manufactures light curtains.  See id. at 27–28 (citing Ryan Dep. at 19–20).  Triad also argues

that Dr. Ryan's reconstruction of the accident at issue was deficient in a number of respects and

that he has not performed various calculations necessary to support his opinion.  See id. at 28

(citing Ryan Dep. at 21–45).

At its core, Triad's claim that Dr. Ryan lacks the requisite experience to be an expert on

light curtains is a challenge to his "specialized knowledge" under the first prong of the Third

Circuit's test for experts.  However, as noted above, Dr. Ryan is a licensed professional engineer

with years of experience as a professor of engineering, a machine designer, a product developer, and an accident reconstructionist.  He has testified regarding light curtains in the past, and he reviewed materials regarding light curtains as part of his preparation in this case.  See Light Curtain Information, attached to Pls.' Index at Ex. B, App'x F; Light Curtain Alternate Designs, attached to Pls.' Index at Ex. B, App'x M (containing patents for alternate light curtain designs); Ryan Dep. at 24–25 (referring to the Installation Manual and Operation Manual of Super Light VI).  Furthermore, he inspected the particular light curtain at issue in this case.  While his inspection occurred well after the accident, given his experience and qualifications, the Court finds that he possesses "skills or knowledge" regarding light curtains that are "greater than the average layman."  See Elcock, 233 F.3d at 741.  Thus, he satisfies the "specialized knowledge" prong of the analysis.

Most of Triad's other attacks on Dr. Ryan go to the "reliability" of his opinions under the second prong of the test.  Triad argues that Dr. Ryan admitted in his deposition that he did not make certain measurements and calculations with respect to the positioning of the light curtain or the stop time of the press when he conducted his inspection and accident reconstruction, that he is unaware of certain measurements and calculations with respect to the positioning of the light curtain and the stop time of the press at the time of the accident, and that he does not know how to set up a light curtain.  See Triad Mem. at 28–29.  However, closer inspection of Dr. Ryan's deposition testimony reveals that many of his opinions were based upon his observations of the light curtains during his inspection and that he believes that most of the measurements and calculations referred to by Triad are not necessary for his opinions.  See Ryan Dep. at 21–26.[10]

_____

[10]    See also, e.g., Ryan Dep. at 79–80 ("In other words, looking at the mounting mechanism, mechanisms are simply drawings.  You make drawings.  You make sketches.  You look at it.  What I did, I looked at the mounting device and said, what are these people thinking about?  What is the reason [to] have it variable up and down to vary it?  There's none.  So, this is

His testimony also reveals that the light curtains' operation manual provides information regarding, for example, the equation for calculating the stop time for the press that is needed to operate the light curtain even if he did not do such a calculation.  See id. at 71.

As was the case with Ingersoll-Rand's criticisms of Dr. Ryan, the Court concludes that any issues that Triad has with the timing of Dr. Ryan's reconstruction or his failure to make certain measurements or calculations would be more properly addressed on the merits, such as through cross-examination or through Triad's own expert witnesses, rather than by excluding Dr. Ryan as a witness.  See, e.g., Fisher, 277 F. Supp. 2d at 507–08 ("While we acknowledge that some of his conclusions may not be proven by the methodology relied upon, 'the analysis of the conclusions themselves is for the trier of fact when the expert is subject to cross-examination.'" (quoting Kannankeril v. Terminix Int'l Inc., 128 F.3d 802, 806 (3d Cir. 1997))).  While the Court agrees with Triad that there may be "better grounds for an alternate conclusion" or "some flaws in [Dr. Ryan's] methods," his opinions are based on his knowledge and use of engineering principles and, in particular, on his own inspection of the light curtains involved in this case, and therefore satisfy the "reliability" prong of the Third Circuit's test.  See id. at 508 ("As the Third Circuit has recognized, the test for admissibility does not require a party to demonstrate that its expert's opinions are correct, but rather whether it is based upon reliable methodology." (citation omitted)).

Finally, the Court notes that Dr. Ryan's testimony regarding the light curtains "fits" the

---

basically an engineering decision that the mounting device should have been done by Triad, and it should have been well explained . . . . Triad would have had more ability to design and build a device to mount this thing onto their press, which is prepared and ready to go."); id. at 80–81 ("This is standard of care engineering practice.  I don't think there's one formula that would make any difference in this case . . . It's just observation.  It's just practice of engineering, but where there is a science or where there is a knowledge[,] is the foreseeability of it being adjusted too high, the foreseeability of it possibly having the light diodes fail and it not shut off.").

instant case in that he suggests Plaintiff's accident would not have occurred had the light curtain been fixed vertically and not malfunctioned at the time of the accident. Accordingly, Dr. Ryan will be permitted to testify as an expert on the light curtains at issue in this case.

## IV.   Strict Liability

### A.   Defective Product Design

Ingersoll-Rand and Triad have moved for summary judgment on the grounds that Plaintiff has not established that either the power press or the light curtains were designed defectively under the standard set forth in the Restatement (Second) of Torts § 402A, as adopted by Pennsylvania.

### 1.   Legal Standard

In Pennsylvania, to prevail on a claim of defective design in a product liability action, a plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm. Ellis v. Chicago Bridge & Iron Co., 545 A.2d 906, 909 (Pa. Super. Ct. 1988). Before reaching causation, a plaintiff first must satisfy the threshold inquiry as to whether there is a defect.[11] Riley v. Warren Mfg., 688 A.2d 221, 224 (Pa. Super. Ct. 1997). "It is a judicial function to decide whether, under the plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint." Azzarello v. Black Bros. Co., 391 A.2d 1020, 1026 (Pa. 1978); see also Surace v. Caterpillar, Inc., 111 F.3d 1039, 1049 n.10 (3d Cir. 1997) ("[T]he question for the court to determine [under the Azzarello analysis] is whether the evidence is sufficient, for

---

[11]     Neither Ingersoll-Rand nor Triad contest causation in the instant Motions with respect to Plaintiff's defective design claims, so the only issue is whether Plaintiff has established as a matter of law that he can show defectiveness.

purposes of the threshold risk-utility analysis, to conclude as a matter of law that the product was not unreasonably dangerous, not [as under a typical summary judgment standard] whether the evidence creates a genuine issue of fact for the jury.").  Such a judicial determination is necessary because as a threshold matter whether a product is unreasonably dangerous is a question of law whose "resolution depends on social policy."  Azzarello, 391 A.2d at 1026.

To prove that a product has a defective design, a plaintiff must show that the product was "lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for its intended use."  Id at 1027.[12]  However, "risk of loss will not be placed on the supplier or manufacturer where an inherent danger is within the contemplation of the buyer, i.e., where there is no element which will remove the risks inherent in its intended use."  Hite v. R.J. Reynolds Tobacco Co, 578 A.2d 417, 421 (Pa. Super. 1990).  The Pennsylvania Superior Court has identified a number of factors a court may consider in making its determination: (1) the usefulness and desirability of the product, including its utility to both the user and the public; (2) the likelihood that the product will cause injury and the seriousness of such injuries; (3) the availability of a substitute product that would meet the same need and not be unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its

---

[12]      In their briefs, Ingersoll-Rand and Plaintiff debate whether Plaintiff has adequately set forth a "feasible alternative design" according to the standard set forth in Habecker v. Clark Equip. Co., 942 F.2d 210, 214–15 (3d Cir. 1991).  However, that standard is inapplicable to the instant case.  Unlike the instant case, Habecker was a "crashworthiness" case.  See id.  "[C]rashworthiness . . . is a variation of strict liability theory [that] extends the manufacturer's liability to situations in which the defect did not cause the accident or initial impact, but rather increased the severity of the injury over that which would have occurred absent the defective design."  Barris v. Bob's Drag Chutes & Safety Equip., Inc., 685 F.2d 94, 99 (3d Cir. 1982) (citations omitted).  While appropriate in a crashworthiness case, the "feasible alternative design" standard has no place in a standard design defect case, in which "the focus must remain . . . on whether the product at issue contains all of the elements necessary to make it safe for its intended use."  Farra v. Stanley-Bostitch, Inc., 838 F. Supp. 1021, 1027 (E.D. Pa. 1993).

16

usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger

by the exercise of care in the use of the product; (6) the user's anticipated awareness of the

dangers inherent in the product and their avoidability, because of general public knowledge about

the obvious condition of the product or about the existence of suitable warnings; and (7) the

feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the

product or carrying liability insurance.  Dambacher v. Mallis, 485 A.2d 408, 423 n.5 (Pa. Super.

Ct. 1984); see also Fitzpatrick v. Madonna, 623 A.2d 322, 324 (Pa. Super. Ct. 1991) (citing

above factors); Surace, 111 F.3d at 1047 (stating that the application of the above factors likely

would be approved by the Pennsylvania Supreme Court).

### 2.  Alleged Defects in the Press

Ingersoll-Rand argues that the Court, in its role of analyzing social policy, should decide

as a matter of law that the power press is not unreasonably dangerous.  Plaintiff claims that the

press is defectively designed in two ways: (1) the press controls should have been fixed in

position; and (2) the press should have been equipped with a PLC that would have detected

whether two workers were operating the press properly.  In its Motion, Ingersoll-Rand

specifically addresses only the second of Plaintiff's two contentions, so the Court will

consider only whether summary judgment is appropriate as to the second claimed defect.

Dr. Ryan posits that a PLC would reduce the risk of injury by monitoring to ensure that

two workers do not operate the press in such a way that one is reaching into the press while the

other operates the hand controls.  See Ryan Rep. at ¶¶ 13–14.  Specifically, Dr. Ryan has

suggested that a PLC could be used to monitor the time between when the light curtain is

breached and when the two controls are pressed.  See id.; Ryan Dep. at 99–101.  If the time

between the two is too short, according to Dr. Ryan, it would indicate that two workers are

present, with one breaching the light curtains to reach into the press while the other operates the

hand controls alone, and the PLC then could prevent the press from operating.  See Ryan Rep. at

¶¶ 13–14; Ryan Dep. at 99–101.[13]

Turning to the seven factors identified by the Pennsylvania Superior Court in Dambacher,

the Court finds as a matter of law that recovery is not justified on the theory advanced by

Plaintiff.  Plaintiff urges the Court to place the most weight on factor two, the safety aspects of

the product.  By necessity, presses are dangerous.  As Dr. Ryan stated, "[y]ou cannot eliminate

the hazard, because you need the force to come down and squash the parts."  Ryan Dep. at 94.

Indeed, Dr. Ryan cites to data from the United States Bureau of Labor Statistics that show as of

the mid-1980s, 10% of all reported amputations annually in the United States occurred among

power press operators.  See Injuries and Amputations Resulting from Work with Mechanical

Power Presses, attached to Pls.' Index at Ex. B, App'x G.  Given the likelihood of injury for

those who work with power presses, and the potential severity of such injuries, Plaintiff is correct

that strong safety measures are necessary.

Nevertheless, the most important factors here counsel against liability.  Pursuant to factor

four, the Court may consider the manufacturer's ability to eliminate the unsafe character of the

product without impairing its usefulness.  Plaintiff has not produced evidence that employing a

PLC in the manner Dr. Ryan proposes would leave the utility of the press unaffected.  See Ryan

Dep. at 149–51 (stating that Dr. Ryan did not test his theory).  In fact, the record demonstrates

---

[13]       Dr. Ryan also has suggested that the PLC could be used to monitor the light
curtains to ensure that all individual lights are working.  See Ryan Rep. at ¶ 14.  His idea appears
in a single sentence in his expert report.  Since the contention relates only to the function of the
light curtains, it is not clear whether he is suggesting this is the responsibility of Ingersoll-Rand
or Triad.  Because Plaintiff has not provided sufficient explanation for the Court to analyze Dr.
Ryan's suggestion, the Court cannot find as a matter of law that the power press is potentially
defective in the suggested manner.

that the contrary is true.  Dr. Ryan states that on-site programming would be necessary to adjust the time gaps the PLC measures.[14]  Dr. Ryan's testimony suggests that frequent reprogramming of the PLC may be necessary for different pairs of workers who work at different paces.  The incidents on the day of the accident bear this out.  On that day, Thumm replaced another worker as Plaintiff's partner at the press because the other worker had been operating too slowly.  See Deposition of Thumm at 31–32, attached to Ingersoll-Rand Mot. at G and Triad Mot. at G ("Thumm Dep."); Deposition of Rohan Scott at 44–45, attached to Ingersoll-Rand Mot. at Ex. H and Triad Mot. at Ex. I.  The time lapse necessary for the PLC to establish that Thumm's predecessor was not using the press improperly may well be different from that for Thumm.  Dr. Ryan's proposal thus apparently would require companies using presses to make costly efforts to keep careful records on employees' work speed and to reprogram the PLCs regularly.  Without testing or more explanation from Dr. Ryan, the Court must conclude that even viewing the evidence in a light favorable to Plaintiff, Dr. Ryan's proposed modification would impair sharply the usefulness of the product.

Several other factors favor Ingersoll-Rand as well.  While Ingersoll-Rand does not address the first factor, the utility of the product, and Plaintiff urges the Court not to give it great weight, nevertheless it is important to acknowledge that the press is a useful product notwithstanding its danger.  See generally Ryan Dep. at 53 (noting that the press can employ "[a]

_____

[14]     See Ryan Dep. at 155 ("[To determine what a reasonable amount of time would be to lapse between the interruption of the light curtains and the pressing of the buttons,] in the first place, if you're going to put this into a factory, you're going to know what these reasonable amounts of time are.  You're going to be able to go out there with a stopwatch, look at [it], click, click, click.  So you need four seconds.  So you need ten second [sic].  That's all changeable.  So you finally get this and then you're going to be assured that the plant people cannot change that.  They'll have to call you in.  They'll say would you send a maintenance guy or a guy that knows how to program this thing, because we need a little bit more time or whatever.  So it's totally doable.").

zillion" dies and could produce an "[i]nfinite number" of parts).  Plaintiff also has not offered

any evidence, pursuant to factor three, of a safer substitute product that uses a PLC in the manner

suggested by Dr. Ryan.  While Ingersoll-Rand could spread the cost of injuries pursuant to factor

seven, the Court finds that this is not enough to overcome the factors weighing in Ingersoll-

Rand's favor.  In sum, the Court finds as a matter of law that Plaintiff has failed to show that the

power press is lacking an element necessary to make it safe, and Ingersoll-Rand's Motion for

summary judgment as to the instant theory will be granted.[15]

### 3.      Alleged Defects in the Light Curtains

Plaintiff argues that Triad's light curtains were defectively designed in two ways: (1) the

light curtain should have been designed to automatically shut off the press in the event a part of

the detection system failed and (2) a weld pad should have been provided with the curtains.

Triad contests both arguments.

### a.      Failure to Stop Press on Alleged Malfunction

First, Plaintiff contends that the light curtains should have been designed to cause the

press to be placed in a non-operative state when an element of the light curtains failed.  In other

words, he contends that the light curtains should have been designed with a backup or fail-safe

system, so that they would still protect the press operator by disabling the press in the event of

their malfunction.  Here, he claims that the light curtains allowed the press to continue to

function even though the lower part of the light curtain was not working when Dr. Ryan

conducted his inspection.[16]  See Resp. to Triad Mot. at 9–10.

---

[15]      Again, because Ingersoll-Rand does not challenge Plaintiff's other theory of strict liability for defective design, that claim will survive the instant Motion.

[16]      Plaintiff also identifies the allegedly broken lower part of the light curtain as, itself, a defect.  See Resp. to Triad Mot. at 9 ("In addition, Dr. Ryan opines that the lower part of the light curtain was not working. This makes the light curtain defective.").  Insofar as this

Plaintiff cites Myers v. Triad Controls, Inc., 720 A.2d 134 (Pa. Super. Ct. 1998).  Like the instant case, Myers concerned Triad light curtains that, allegedly because of defects, failed to prevent a worker from being injured by a press.  In Myers, the plaintiff was instructed to use a die in the press so large that it interfered with the light curtain.  See id. at 134–35.  Maintenance workers intentionally disconnected the light curtain by shorting out the contacts between it and the punch press.  See id. at 135.  The light curtain had a green light and a red light; the red light normally illuminated when an object crossed the curtain.  See id. at 134.  Despite the connection to the press being broken, the green light remained lit even when objects passed through the curtain, and the plaintiff subsequently was injured.  See id. at 135.  The court found Triad liable, stating that "[a] guard provides a worker with a sense of safety and security.  Where, absent any warnings, a guard system can be disabled and yet continue to emit a green light, and where no viable method is included for a user to determine if it is performing its safety function, the jury should be free to consider whether it has been defectively designed."  Id. at 136.

While Plaintiff focuses on Myers, Triad cites to Davis v. Berwind Corp., 640 A.2d 1289 (Pa. Super. Ct. 1994).  In Davis, the plaintiff was injured by a meat blender after her employer

---

allegation is a claimed basis for strict liability, it is characterized properly as a claim of a manufacturing defect rather than a design defect.  See Phillips v. Cricket Lighters, 841 A.2d 1000, 1019 (Pa. 2003) (Saylor, J., concurring) ("Manufacturing defects are discerned according to a fairly straightforward test: they are deemed present when a product fails to conform to its intended design. . . . [In contrast,] a product is deemed defective in design when the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design.").  To show a manufacturing defect, Plaintiff must introduce evidence tracing the alleged failure in the lower part of the light curtains to Triad.  See Donoughe v. Lincoln Elec. Co., 936 A.2d 52, 61 (Pa. Super. Ct. 2007) ("In all products liability cases, the plaintiff must prove the existence of a defect in the product that was present at the time the product left the control of the manufacturer.").  However, he has failed to introduce any such evidence.  See Deposition of Gary Kovac ("Kovac  Dep.") at 13, attached to Ingersoll-Rand Mot. at Ex. D and Triad Mot. at Ex. D (stating that the light curtains were manufactured in the early 1990s); Ryan Dep. at 9 (stating that Dr. Ryan, Plaintiff's only expert, first inspected the light curtains on November 17, 2005).

removed a safety device from the blender to make it faster to use.  See id. at 1291–92.  The

Pennsylvania Superior Court found that by including the safety device and warning not to

remove it, the manufacturer had fulfilled its responsibility to design a safe product.  See id. at

1299–30.  The court stated that finding strict liability would "leav[e] no incentive, economic or

otherwise, for the buyer/employer to heed the manufacturer's safety precautions or the

Commonwealth's health and safety laws."  Id. at 1299.

Plaintiff's claim is more similar to that raised in Myers than that in Davis.  In both the

instant case and Myers, the plaintiff asks for an additional layer of protection in the face of a

malfunction.  Just as the Myers court found that a jury could conclude that the light curtains in

that case were defective because they did not alert users that they were not functioning, here a

jury could conclude that the light curtains were defective because they should have continued

offering protection by shutting down the press even when part of their sensor was not working.[17]

As in Myers, light curtains without the suggested modification may actually be counterproductive

as safety equipment; they could create the illusion of safety and lead employees to be less careful

than if there were no apparent protection at all.

The instant case is distinguishable from Davis, whose reach the Pennsylvania Superior

Court subsequently has limited.  See Myers, 720 A.2d at 136 (distinguishing Davis); Dougherty

v. Edward J. Meloney, Inc., 661 A.2d 375, 385 (Pa. Super. Ct. 1995).  Unlike the removal of the

guard in Davis, the alleged failure of the lower part of the light curtain is not an "intervening

cause" that was an "unforeseeable and . . . substantial change in the condition of the product."

Dougherty, 661 A.2d at 386 (interpreting Davis).  Here, it is foreseeable that over the course of

---

[17]        A finding of potential liability is supported by the "Heirarchy of Safety" espoused
by Dr. Ryan, according to which it is better to employ safety measures based on physical design
than it is to rely on modifying human behavior through training or instructions.  See Product
Design Theory, attached to Pls.' Index at Ex. B, App'x E.

years a portion of the light curtains might cease working.  Additionally, unlike in Davis, there is no allegation that the alleged failure of the lower part of the light curtain resulted from an external intervening cause, as was the case with the removed safety device; instead, the lower part of the light curtains may have simply worn out.

Further, allowing Plaintiff to proceed on the instant theory is supported by a number of the factors that the Court may consider in its "social policy" gatekeeping role.  While Dr. Ryan admits that the light curtain is "a great product," Ryan Dep. at 56, designing the curtain to shut down the press if the light sensors malfunction would eliminate the danger of using the press with a broken curtain.  In contrast to Dr. Ryan's proposal regarding the press and the PLC, there is no indication here that the proposed alteration would impair the usefulness of the light curtains or make them too expensive to maintain their utility.  Plaintiff's proposal would eliminate the danger to a user who is unaware of a sensor malfunction, which presently may be difficult to detect even through the exercise of care by workers who are not engineers or skilled with electronics.  Finally, while Plaintiff does not allege that the light curtain is dangerous itself, the equipment with which the light curtain can be paired, such as the press, can cause severe injuries, as discussed supra Section IV.A.2.  Accordingly, as to the instant claimed basis for defective design, the light curtains can be deemed unreasonably dangerous, and Triad's Motion will be denied.

### b.    Failure to Include Weld Pad

Second, Plaintiff contends that the light curtains were defectively designed in that they could be adjusted too high for safe operation and did not come equipped with a weld pad with tapped mounting holes to prevent them from being adjusted vertically.  See Resp. to Triad Mot. at 9–10.  Dr. Ryan opines that "there is no reason to design into the safety system a vertically

adjustable light curtain, which can be adjusted improperly by plant maintenance."[18]  Ryan Rep. at

¶ 2.  He believes that "there should be no vertical adjustment of the light curtain since the floor

and the height of workers is a known ergonomic distance."  Id.  He contends that light curtains

should come with a weld pad with tapped mounting holes, along with detailed mounting

instructions, so that the purchaser can permanently fix the vertical height of the light curtains.  Id.

The fundamental problem with Plaintiff's second alleged defect is that providing a weld

pad and tapped mounting holes would not eliminate the problem of human error in vertically

mounting the light curtains.  Plaintiff does not suggest that Triad should sell light curtains that

are already permanently vertically fixed or that Triad should perform installation functions for

purchasers.  Instead, his theory rests on the assumption that purchasers, in performing one

permanent installation, will mount the light curtains vertically with a lower error rate than if

purchasers are left to choose their own mounting method, which may include vertically

adjustable mounting methods.  Yet he has not provided evidence to justify the assumption that a

"one-shot" installation will be correctly mounted more reliably than a potentially flexible

installation.

Further, the factors the Court may employ in considering the "social policy" of allowing a

strict liability claim to go forward weigh against allowing Plaintiff's second theory to reach the

jury.  As discussed above, selling the light curtains with a weld pad and tapped mounting holes

would not eliminate the risk of human error in installation, so the manufacturer cannot eliminate

the unsafe aspect of the product.  The purchaser of the product can avoid any danger of

excessively high mounting through proper care in installation and maintenance.  Additionally, it

---

[18]     Triad disputes this contention.  See Hr'g Tr. (4/21/2008) at 71 ("THE COURT: So
the height required of a light curtain will vary depending upon the use of the equipment?  TRIAD
COUNSEL: Yes, it could.").

is not feasible for Triad to spread the risk of improper installation through pricing or insurance. Accordingly, the Court finds that even in the light most favorable to Plaintiffs, the light curtains are not unreasonably dangerous for failing to come with a weld pad and tapped mounting holes, and Triad's Motion will be granted.[19]

### B.    Applicability of Federal and State Regulations

Triad and Ingersoll-Rand both argue that federal OSHA regulations mandate that employers are responsible for properly setting up press equipment and supplying safety guards, and that they cannot be held responsible for an employer's failure to comply with these regulations. See Triad Mot. at 18–24 (citing 29 C.F.R. § 1910.217(c), which provides that it is the responsibility of the employer "to provide and insure the usage of 'point of operation guards' or properly applied and adjusted point of operation devices on every operation performed on a mechanical power press"); Ingersoll-Rand Mot. at 14–16.  However, "[a] product manufacturer in Pennsylvania has a non-delegable duty to provide a safe product."  Forrest, 424 F.3d at 352 (citing Walton v. Avco Corp., 610 A.2d 454, 458 (Pa. 1992)).[20]  "Thus, a manufacturer in a products liability action may not invoke industry or OSHA standards to argue that the plaintiff's employer, rather than the manufacturer, had the responsibility to provide the equipment or

---

[19]     Triad additionally argues that summary judgment is appropriate as to Plaintiff's second claimed defect because the light curtains were not being used as intended at the time of the accident.  See Triad Mot. at 17–18.  Because summary judgment is appropriate on other grounds, the Court need not reach this argument.

[20]     Ingersoll-Rand cites Fisher, 296 F. Supp. 2d at 566, for the proposition that a defendant cannot be held strictly liable for failing to provide point of operation safety guards where regulations place the responsibility on employers to provide these guards.  See Ingersoll-Rand Mot. at 15.  The Court, however, rejects these arguments as they run contrary to the Third Circuit's recent decision in Forrest.

instructions necessary to make a product safe for its intended use."[21]  Id. (citations omitted).

In an attempt to avoid Forrest, Ingersoll-Rand argues that the press was not a "completed product" when it left its control.  When considering a product that is not complete when it leaves the hands of the manufacturer, and whose final form involves the input of multiple parties, the "jury may consider such factors as trade custom, safety codes, [and] laws and regulations," in order to determine whose responsibility the alleged defect is.  Hoffman v. Niagra Mach. & Tool Works Co., 683 F. Supp. 489, 491 (E.D. Pa. 1988).  Ingersoll-Rand mistakenly asserts that a number of federal courts "have held that mechanical power presses are not 'completed products'" for the sole reason that "there are many different kinds of jobs that can be performed by mechanical power presses requiring different types of dies and 'feeding methods.'"  Ingersoll-Rand Mot. at 40.  In fact, in none of the cases to which Ingersoll-Rand cites did the court hold, as a matter of law, that power presses that have not yet had dies attached are incomplete products. See Hoffman, 683 F. Supp. at 490–92 (stating that the jury returned a verdict for the defendant after the court instructed the jury that it could consider trade customs if the product was not complete); Rooney v. Fed. Press Co., 751 F.2d 140, 143 n.3 (3d Cir. 1984) (stating that the court would not reach the contention that the press is not complete until dies are installed); Christner v. E.W. Bliss Co., 524 F. Supp. 1122, 1125 (M.D. Pa. 1981) (stating that if the jury finds that the product was not complete when it left the hands of defendants, then it could consider trade custom and regulations); Heckman v. Federal Press Co., 587 F.2d 612, 616–17 (3d Cir. 1978) (finding that Pennsylvania regulations regarding the responsibility of employers did not absolve a

---

[21]      Consideration of industry standards and regulations may be appropriate with regard to the negligence claims because "evidence of industry standards and regulations is generally relevant and admissible on the issue of negligence."  Arnoldy v. Forklift, L.P., 927 A.2d 257, 263 (Pa. Super. Ct. 2007).  However, Defendants' Motions do not argue explicitly for summary judgment on the negligence claims; therefore, the Court is unable to conclude that there are no genuine issues of material fact for trial with respect to these claims.

manufacturer of design defect liability and refusing to find as a matter of law that a part added by

the purchaser absolved the manufacturer of liability).  Further, Ingersoll-Rand has not articulated

how the press was incomplete <u>in relation to the specific defects</u> alleged by Plaintiff, which are

unrelated to the die.  Without demonstrating a connection, Ingersoll-Rand cannot show why the

jury should be required to consider trade customs and other information in order to allocate

responsibility for the alleged defects.  Accordingly, the Court will not hold as a matter of law that

the power press is an incomplete product.  Thus the Court will not, as Defendants have

suggested, consider OSHA standards in determining whether summary judgment on Plaintiff's

strict liability claims is appropriate.[22]

Triad argues that Laneko violated Pennsylvania statutory law due to its failure to set up

the light curtains properly.  See Triad Mot. at 19–22.  Triad claims that it should be absolved of

responsibility by Laneko's alleged failure to comply with Pennsylvania law, which Triad argues

places responsibility for remedying problems with safety devices, such as the improperly aligned

light curtains, on Laneko.  See id.  Nevertheless, as discussed supra, manufacturers have a non-

delegable duty to provide a safe product in Pennsylvania; thus any statutory duties placed on

employers to use Triad's equipment in a safe manner run independently of Triad's duty to

provide a safe product.

---

[22]      Plaintiff has also invoked OSHA regulations, arguing that they support one of his
claims for strict liability.  In addition to the other support discussed <u>supra</u> in Section IV.A.3.a,
Plaintiff argues that the failure of the light curtains to shut down the press upon malfunction
violates the OSHA standards set forth in 29 C.F.R. §§ 1910.217(b)(13), (c)(3)(iii)(c).  See Resp.
to Triad Mot. at 6.  It is unclear under Pennsylvania law whether a plaintiff can invoke OSHA
standards in support of his case.  See generally Nesbitt v. Sears, Roebuck & Co., 415 F. Supp. 2d
530, 534–35 (E.D. Pa. 2005) (discussing the ambiguity in caselaw).  Because the Court finds that
Plaintiff's contention may survive without resort to the OSHA regulations, <u>see</u> <u>supra</u> IV.A.3.a,
the Court need not resolve the issue at this time.

**C.**     **Failure to Warn**

Ingersoll-Rand argues that the portion of Plaintiff's strict liability claim that is based on its alleged failure to warn should be dismissed because Plaintiff has failed to meet his burden of proof.[23]  "In failure to warn cases . . . recovery is sought on the theory that the product is 'unreasonably dangerous' when 'unaccompanied by a warning with respect to nonobvious dangers inherent in the use of the product.'"  Fisher, 296 F. Supp. 2d at 566 (quoting Ellis v. Chicago Bridge & Iron Co., 545 A.2d 906, 908 (Pa. Super. Ct. 1988)).  "To proceed on a failure to warn theory, a plaintiff must establish that (1) a warning was either absent or inadequate, and (2) the user would have avoided the risk had he been advised of it by the seller."  Blake v. Greyhound Lines, Inc., 448 F. Supp. 2d 635, 642 (E.D. Pa. 2006) (citation omitted).  To show that a warning was inadequate, a plaintiff must show that the deficiency in warning made the product unreasonably dangerous.  See Phillips v. A-Best Prods. Co., 665 A.2d 1167, 1171 (Pa. 1995).  To establish causation, "the plaintiff must establish that it was the total lack or insufficiency of a warning that was both a cause-in-fact and the proximate cause of the injuries."  Pavlik v. Lane Ltd./Tobacco Exps. Int'l, 135 F.3d 876, 881 (3d Cir. 1998) (citations omitted).  "While the question of causation in Pennsylvania is normally for the jury, 'if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law.'"  Id. (quoting Conti, 743 F.2d at 197–98).

Plaintiff's expert Dr. Ryan identifies two alleged failures by Ingersoll-Rand: (1) the warning labels on the press were not of adequate durability to remain legible for the effective life of the press; and (2) Ingersoll-Rand failed to warn adequately of the point of operation hazard

---

[23]     Triad has not moved for summary judgment on the failure to warn claim against it.

inherent in power presses.  Plaintiff does not understand English.[24]  Thus any failure to properly affix the existing warnings, which were in English,[25] or provide additional warnings in English would have been futile and as such was not a cause in fact of Plaintiff's injury.

Dr. Ryan, however, suggests that Ingersoll-Rand should have provided the above-discussed warnings in Spanish.  See Ryan Dep. at 129–31.  Different courts in different contexts have come to different conclusions regarding the adequacy of English-only warnings for non-English speaking plaintiffs.  For instance, in Ramirez v. Plough, Inc., 863 P.2d 167, 174–78 (Cal. 1993), the California Supreme Court held that manufacturers of nonprescription drugs, which were subject to FDA regulations, were under no duty pursuant to tort law to provide warnings in languages other than English.  The California Supreme Court asserted that decisions about non-English warnings in this context were especially appropriate for legislative bodies rather than courts.  See id.  In contrast, in Stanley Indus., Inc. v. W.M. Barr & Co., 784 F. Supp. 1570, 1574–76 (S.D. Fl. 1992), the district court held that it was a question for the jury whether the defendant had failed to provide adequate warnings in Spanish where the defendant targeted the large Hispanic population in Miami through Hispanic-oriented media in selling the device in question.

In the instant case, the Court does not find it necessary to consider the apparent blanket barrier to liability adopted by the California Supreme Court in Ramirez, as the instant case can be decided on narrower grounds.  In contrast to Stanley Industries, there is no evidence that Ingersoll-Rand intended to target Spanish-speaking populations or reasonably expected that its

---

[24]    Plaintiff's deposition was conducted with the assistance of a Spanish interpreter, and he admitted that he cannot read or speak English.  See Dep. of Fernando Martinez at 5–6, attached to Ingersoll-Rand Mot. at Ex. I and Triad Mot. at Ex. A ("Pl. Dep.").

[25]    See Images, attached to Ingersoll-Rand Mot. at Ex. F.

press would be sold to or used by Spanish speakers.  Indeed, the press was manufactured and

sold in Ontario, Canada in 1978.  See generally Profile of Hispanic community in Canada,

attached to Ingersoll-Rand Mot. as Ex. R (illustrating the small Hispanic population in Canada).

After considering relevant cases, Professor Keith Sealing suggests liability should exist for

failing to provide Spanish-language warnings where (1) the product is sold or used in a

geographic area of dense Hispanic population; (2) the product has been marketed toward

Hispanics, such as on Spanish-language cable television; or (3) the product is used in an industry

with a large percentage of Hispanic workers, such as the migrant farm industry.  Keith Sealing,

Peligro!: Failure to Warn of a Product's Inherent Risk in Spanish Could Constitute a Product

Defect, 11 Temp. Pol. & Civ. Rts. L. Rev. 153, 154 (2001).  If the Court allowed liability here, it

would suggest the need for too many warnings in too many languages when it would not be

foreseeable that such warnings would be useful.  Accordingly, Ingersoll-Rand's Motion will be

granted as to Plaintiff's claim for liability for failure to warn.

**D.     Assumption of Risk**

Finally, both Triad and Ingersoll-Rand argue that Plaintiff assumed the risk of his

injuries, thereby barring recovery under either a strict liability or a negligence theory.  Under

Pennsylvania law, assumption of risk is a complete defense to strict liability and negligence

claims.  See, e.g., Karim v. Tanabe Mach., Ltd., 322 F. Supp. 2d 578, 581 (E.D. Pa. 2004) (citing

Dillinger v. Caterpillar, Inc., 959 F.2d 430, 445 (3d Cir. 1992)).  In order to prevail on this

defense, Defendants must show that Plaintiff "knew of the defect and voluntarily and

unreasonably proceeded to use the product or encounter a known danger."  Id. (quoting Wagner

v. Firestone Tire & Rubber Co., 890 F.2d 430, 445 (3d Cir. 1989)); see also id. ("[O]nly if a

plaintiff fully understands the specific risk, voluntarily chooses to encounter it, under

circumstances that manifest a willingness to accept it, is he said to have assumed the risk.");

Blake, 448 F. Supp. 2d at 642 ("To avoid liability based on assumption of the risk on either a strict liability or negligence claim, a defendant must produce evidence that the plaintiff fully understood the specific risk, and yet voluntarily chose to encounter it." (internal quotation omitted)).  Citing Plaintiff's deposition testimony, Defendants argue that he understood the risk involved with operating the press with only one set of palm buttons for two users, yet proceeded to operate the press in this manner anyway.  See Ingersoll-Rand Mot. at 47–50; Triad Mot. at 33–35.[26]

Plaintiff counters that the assumption of risk defense does not apply since he was acting within the scope of his employment at the time of his accident.  See Resp. to Ingersoll-Rand Mot. at 29–30; Resp. to Triad Mot. at 29–30.  "Pennsylvania courts have held that where an employee is required to use certain equipment in the course of his employment, and uses that equipment as directed by the employer, the employee cannot be said 'voluntarily' to have assumed the risk of encountering any dangers associated with the equipment."  D'Angelo v. ADS Mach. Corp., 128 F. App'x 253, 256 (3d Cir. 2005) (citations omitted); see also Jara v. Rexworks, Inc., 718 A.2d 788, 795 (Pa. Super. Ct. 1998).  Plaintiff testified that the machine on which he was working on the day of the accident had been set up to utilize only one set of palm buttons for approximately a month to a month-and-a-half prior to the accident.  See Pl. Dep. at 117.  When asked at his deposition why the second set of palm buttons was not attached, he responded that he "figured that maybe they were trying to save time.  Because when you only use one set of buttons, it took less time."  Id. at 101.  Plaintiff's co-operator at the time of the accident, Thumm, testified at his deposition that press operators do not receive any training on setting up the press's controls or

---

[26]   For example, Plaintiff testified that he understood that "when the [press] is working, I could lose my hands and even my life," and that when he mentioned his concerns about having two operators working on a machine with only one button, he had been told by a co-worker that "it is dangerous to operate the machine in that way."  Pl. Dep. at 99, 119.

adjusting the light curtains on the press.  <u>See</u> Thumm Dep. at 15.  He further testified that as an operator, his job was "to operate.  [The presses] were supposed to be ready at the time. . . . We didn't have to check anything."  <u>Id.</u> at 34; <u>see also</u> <u>id.</u> at 15 (testifying that his job was "[s]trictly [to] operate the press and, you know, make sure it was running okay, that it was operating"). Based on this statement, a reasonable jury could find that since Plaintiff was not trained to set up or adjust the press as an operator, he was using the press as directed by his employer at the time of his accident, and therefore that he did not assume the risk voluntarily.  Accordingly, there is a genuine issue of material fact for trial, and summary judgment based on an assumption of risk defense is not appropriate.

**V. Conclusion**

For the aforementioned reasons, the Motions for Summary Judgment of Triad and Ingersoll-Rand will be granted in part and denied in part.  An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FERNANDO MARTINEZ AND    :     CIVIL ACTION
LUCY MARTINEZ, H/W        :
                             :     NO.  05-4534
        v.               :
                             :
TRIAD CONTROLS, INC., <u>et al.</u>    :

## ORDER

**AND NOW**, this      6th            day of January, 2009, upon consideration of the Motion for Summary Judgment of Defendants Ingersoll Rand, Ingersoll-Rand Canada, Inc., and Canada Machinery Corporation, Ltd. (docket no. 52), and all responses thereto, and for the reasons stated in the accompanying Memorandum, its is **ORDERED** that the Motion is **GRANTED** as to Plaintiff's claims, set forth in Counts V and VII of the Complaint, that the product at issue is defectively designed due to its failure to include a Programmable Logic Controller and due to failure to warn.  It is **FURTHER ORDERED** that the Motion is **DENIED** in all other respects. Upon consideration of the Motion for Summary Judgment of Defendant Triad Controls, Inc. (docket no. 53), and all responses thereto, and for the reasons stated in the accompanying Memorandum, its is **ORDERED** that the Motion is **GRANTED** as to Plaintiff's claims, set forth in Count III of the Complaint, that the product at issue is defectively designed due to its failure to include a weld pad with tapped mounting holes.   It is **FURTHER ORDERED** that the Motion is **DENIED** in all other respects.

BY THE COURT:


      **S/ BRUCE W. KAUFFMAN**
      **BRUCE W. KAUFFMAN,  J.**